IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FLS US HOLDINGS, INC. and | : | CIVIL ACTION |
| FLSMIDTH KREBS INC. | : | |
| | : | |
| v. | : | |
| | : | |
| LIBERTY MUTUAL FIRE INSURANCE | : | NO. 13-2511 |
| COMPANY | : | |

## MEMORANDUM

**L. Felipe Restrepo, J.**                                            **January 21, 2015**

FLS US Holdings Inc. ("Holdings") and FLSmidth Krebs Inc. ("Krebs") (collectively, "FLS") bring this diversity action against their insurer, Liberty Mutual Fire Insurance Company ("Liberty Mutual"). FLS seeks from Liberty Mutual: (1) reimbursement of legal fees incurred in defending a suit brought by Leaf River Energy Center, LLC ("Leaf River") in Mississippi state court ("the Leaf River Action"); and (2) indemnification of the settlement amount, alleging coverage of the Leaf River Action under the insurance policy Liberty Mutual issued to Holdings. Liberty Mutual counters that the claims in the Leaf River Action were not covered under the insurance policy, and therefore, Liberty Mutual is not liable to FLS for either the cost of defending the Leaf River Action or the settlement amount. The following motions are presently before the Court: (1) Defendant's [Cross] Motion for Summary Judgment (ECF No. 13), and (2) Plaintiffs' [Cross] Motion for Summary Judgment (ECF No. 14). For the reasons that follow, the Court holds: (1) Pennsylvania law and Mississippi law utilize the same standard for determining when Liberty Mutual owed FLS a duty to defend under the Policy, and (2) Pennsylvania law applies to the scope of the duty to defend that Liberty Mutual owed FLS under the Policy. The Court will deny the remaining portions of the parties' summary judgment motions without prejudice to renewing the motions following the completion of discovery.

I.      **BACKGROUND**[1]

    A.    <u>Factual History</u>

      Krebs is an engineering and manufacturing company that, among other things, designs, manufactures, and supplies hydrocyclones.  First Brancato Decl. (ECF No. 13-2) ¶ 2.  It also provides engineering and professional services related to the equipment it produces.  <u>Id.</u> Holdings owns the parent company of Krebs, which in turn owns 100% of Krebs.  <u>Id.</u>  Liberty Mutual issued a general liability coverage policy to Holdings ("the Policy") with an effective period of March 1, 2010, through March 1, 2011, under which Krebs qualifies as a Named Insured.  JA 96, 110.  The Policy includes an Employed Miscellaneous Professional Liability Endorsement ("EMPLE"), which adds, <u>inter alia</u>, the following to "Section I – Coverages":

> We will pay on behalf of the Named Insured all sums which the Named Insured becomes legally obligated to pay as damages because of claims to which this insurance applies arising out of any "wrongful act" of any "employed professional" in rendering or failing to render "professional services" for or on behalf of and in the course and scope of the said "employed professional's" employment by the Named Insured (but not for the Named Insured's own negligent acts, errors or omissions.)
>
>             * * *
>
> Subject to the deductible and limits of the insurance, we shall have the right and duty to defend any claim seeking damages to which endorsement applies.

JA 72.

      In the Policy, "wrongful act" is defined as "any actual or alleged negligent act, error or omission."  JA 78.  "Employed professional" includes full-time employees who are employed "to perform 'professional services' which the person is legally qualified to perform."  <u>Id.</u> "Professional services" are defined as:

---

[1]  In support of their respective summary judgment motions, the parties have submitted a Joint Appendix (cited herein as "JA"), with each page in the Appendix identified by a Bates Number.

> Design or Specification, Supervision or inspection of building, construction, erection, installation of a type normally undertaken by an architect, engineer or similar construction professional, Feasibility and/or other scientific studies, Technical information calculation, Procurement, Surveying (including quantity surveying); Environmental consulting, Project and construction management; Materials Measurement, testing and certification, Quality Control; Testing and commissioning; Training and/or safety management, Facility management; or Construction management.

JA 79.  The EMPLE coverage limit is $10 million per wrongful act and $10 million in the aggregate.  Id.  The deductible amount for the EMPLE coverage is $960,000.  Id.  Coverage is retroactive to December 27, 1990.  Id.

In 2008, Leaf River entered into a contract with Krebs and BE&K Construction Company, LLC ("BE&K") to design and supply a hydrocyclone for the removal of sand from liquid used in a salt mining operation.  JA 95, 100-01.  After the installation of the sand removal system, Leaf River alleged that the system did not perform properly and Krebs failed to correct the problem after servicing the system.  JA 95, 101.  Eventually, Leaf River abandoned the system, was forced to bypass it, and suffered substantial financial loss as a result.  Id.

On or about March 4, 2010, Leaf River initiated the Leaf River Action by filing a complaint in the Circuit Court of Smith County, Mississippi against Krebs and BE&K.  JA 82-94.  The Leaf River Action contained six separate counts for relief: Count I alleged breach of the express and implied warranty of merchantability against Krebs and BE&K; Count II alleged breach of the warranty of fitness for a particular purpose against Krebs and BE&K; Count III alleged breach of contract against Krebs and BE&K; Count IV alleged failure to repair or replace against Krebs only; Count V alleged negligence against Krebs and BE&K; and Count VI alleged professional malpractice against BE&K only.[2]  JA 87-92.

---

[2]  On April 13, 2012, Leaf River filed an Amended Complaint against Krebs and BE&K.  JA 99-109.  The only substantive difference between the initial Complaint and the Amended Complaint, is that the

Krebs notified Liberty Mutual of Leaf River's claims and requested defense and indemnification in regards to the underlying suit.  First Brancato Decl. ¶ 15.  On April 12, 2010, Liberty Mutual denied Krebs' request for defense and indemnity.  JA 95-97.  Liberty Mutual cited numerous reasons for the denial, none of which mentioned or related to the EMPLE.  Id.  The following day, Krebs' claim consultant contacted Liberty Mutual to inquire about potential coverage under the EMPLE portion of the Policy.  JA 110.  On December 14, 2011, more than 20 months later, Liberty Mutual formally responded to Krebs' inquiry about coverage under the EMPLE.  JA 110-16.   Therein, Liberty Mutual agreed to fund a portion of Krebs' defense in the Leaf River Action, but only with respect to the single count Liberty Mutual believed was potentially covered under the EMPLE – Count V (negligence).  JA 110.  On or about February 27, 2013, Krebs entered into a settlement agreement and release with Leaf River and NGS Energy LP (the "Settlement Agreement") whereby Krebs agreed to pay $1,650,000 to settle the claims in the Leaf River Action, and Leaf River and NGS Energy LP agreed to waive and release its claims against Krebs with respect to the Leaf River Action, the hydrocyclone, and the related facility.  JA 117-123.

B.  Procedural History

FLS commenced the instant action by filing a Complaint against Liberty Mutual on May 7, 2013.  ECF No. 1.  Liberty Mutual filed an Answer on August 7, 2013.  ECF No. 8.  The parties appeared for a pretrial conference on September 9, 2013.  ECF Nos. 9, 12.  At the pretrial conference, the parties agreed that it would be appropriate for the parties to file summary judgment motions without the benefit of discovery, and I entered an order directing the parties to file their cross-motions for summary judgment on or before October 31, 2013.  ECF No. 11.  The

Amended Complaint revised upward Leaf River's demand from $2.5 million to $48 million.  Compare JA 92, with JA 107.

4

parties ultimately appeared for oral argument on their cross-motions for summary judgment on May 6, 2014.  ECF Nos. 36, 38.  Since then, the parties submitted several letters in support of their respective positions.  ECF Nos. 40-42, 44-46.

FLS believes that the claims against Krebs in the Leaf River Action were covered under the EMPLE and triggered Liberty Mutual's duty to defend.  Compl. ¶ 30.  Thus, FLS requests reimbursement of the legal fees and expenses incurred by FLS in defending the underlying litigation and indemnification of the settlement amount, after factoring in exhaustion of the deductible.  Id. ¶ 31-32.  Liberty Mutual argues that the claims in the Leaf River Action were not covered under the Policy, and therefore believes that no duty to defend or duty to indemnify exists.  Def.'s Br. 6.

Both the Plaintiff and Defendant move for complete summary judgment in their favor.  Alternately, if the Court grants summary judgment in favor of Plaintiff on the issue of duty to defend, then Defendant moves for a postponement of the consideration of the summary judgment motions pending discovery related to the duty to indemnify.  Def.'s Br. 9-11.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact's "materiality" is determined by the substantive law at issue, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  Doe v. Abington Friends Sch., 480 F.3d 225, 256 (3d Cir. 2007) (citations omitted).  This

analysis remains unchanged when there are cross-motions for summary judgment.  Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008).  The analysis is unchanged because "[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."  Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968).

Judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The initial burden on the moving party is met by showing that the "non-moving party has failed to establish one or more essential elements of his or her case."  Stacy v. LSI Corp., 544 F. App'x 93, 96 (3d Cir. 2013).   Then the burden shifts to the non-movant, who must show the issue of fact is genuine with specific facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "The non-moving party cannot rest on mere pleadings or allegations" and must point to actual evidence in the record on which a fact finder could rely in deciding its way.  El v. Se. Pa. Transp. Auth., 479 F.3d 232, 242 (3d Cir. 2007).

### III.    DISCUSSION

#### A.  Choice of Law

The Policy does not contain a choice of law provision.  See generally JA 1-81; Pls.' Br. 8. Where there is no pre-existing agreement regarding what law should apply to a contract, the court must make that determination as a preliminary matter.  Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America, 693 F.3d 417, 432 (3d Cir. 2012).  In a diversity action, the court applies the choice of law rules of the state in which it sits.  Klaxon Co. v. Stentor

Electric Mfg. Co., 313 U.S. 487, 496 (1941).  As this Court sits in Pennsylvania, the choice of

law rules of Pennsylvania apply.  "Because choice of law analysis is issue-specific, different

states' laws may apply to different issues in a single case, a principle known as 'depecage.'"

Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006) (recognizing the

application of depecage under Pennsylvania law); see also Griffith v. United Air Lines, Inc., 203

A.2d 796, 805 (Pa. 1964) (adopting Pennsylvania's "flexible" choice-of-law approach and

instructing courts to perform an "analysis of the policies and interests underlying the particular

issue before the court").  "[T]he first part of the choice of law inquiry is best understood as

determining if there is an *actual* or real conflict between the potentially applicable laws."

Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007).

  The parties generally agree that Pennsylvania law should govern the majority of the

contract.  Def.'s Br. 8-9 (noting: (1) no difference between Pennsylvania and Mississippi law on

the interpretation of the policy language, (2) that in the absence of a conflict the court may apply

the law of the state in which it sits, and (3) "Therefore, Pennsylvania law applies to the

interpretation of the policy."); Pls.' Br. 8 ("Should Liberty Mutual disagree with FLS's

contention that Pennsylvania law applies to this case . . . .").  Liberty Mutual argues that

Mississippi and Pennsylvania "do diverge, however, when it comes to appointing counsel for a

lawsuit with potentially covered and non-covered claims."  Def.'s Br. 9 n.4.  Accordingly, the

first step is to determine whether there is an actual conflict between Pennsylvania and

Mississippi law on the various issues relevant to the duty to defend.

   1.  *Triggering the Duty to Defend*

  "Pennsylvania courts have long held that the duty to defend arises whenever claims in the

underlying complaint could 'potentially' come within the scope of coverage."  OneBeacon Am.

Ins. Co. v. Urban Outfitters, Inc., 2014 WL 2011494 at *5 (E.D. Pa. May 15, 2014) (citing Erie

Ins. Exch. v. Claypoole, 449 Pa. Super. 142, 156 (1996)).  Under Mississippi law, "[a]n

insurance company's duty to defend its insured is triggered when it becomes aware that a

complaint has been filed which contains reasonable, plausible allegations of conduct covered by

the policy."  Baker Donelson Bearman & Caldwell, P.C. v. Muirhead, 920 So. 2d 440, 451

(Miss. 2006).  If the policy obligates the insurer to defend the insured for covered claims, the

insured cannot ignore its duty to defend where "the allegations of a complaint reasonably bring a

claim within the coverage of its policy."  Id. at 450-51.  While Pennsylvania and Mississippi use

different terminology to describe the circumstances when the duty to defend is triggered, I

perceive no actual difference between the laws of the two states on this issue.[3]  Accordingly,

there is no conflict between Pennsylvania and Mississippi law regarding the triggering of the

duty to defend, and while I can refer to the laws of those states interchangeably with respect to

this issue, for the sake of simplicity I will refer to the law of Pennsylvania.  See Huber v. Taylor,

469 F.3d 67, 74 (3d Cir. 2006) (citing On Air Entm't Corp. v. Nat'l Indem. Co., 210 F.3d 146,

149 (3d Cir. 2000)) (holding that a court may refer interchangeably to the laws of the states

whose laws potentially apply where there is no conflict).

---

[3]  The parties apparently perceive no difference between the laws of Pennsylvania and Mississippi on this
issue either, as neither party briefed this issue or raised it at oral argument.  Furthermore, following my
Order directing the parties to submit letter briefs on this issue (ECF No. 43), the parties agreed that there
was no difference between Pennsylvania and Mississippi law on this issue and that Pennsylvania law
should therefore apply.  Def.'s Letter (ECF No. 44) ("With respect to the issue of what would need to be
pled in the underlying complaint in order to trigger a duty to defend (i.e. "when a duty arose"), I believe
the parties are in agreement that Pennsylvania law would apply."); Pls.' Letter (ECF No. 45) ("Plaintiffs
believe that there is no meaningful difference between the law of Mississippi and of Pennsylvania
respecting the triggering of the duty to defend and thus under Pennsylvania choice of law principles there
is no need to conduct a choice of law analysis.").

2.   *Scope of the Duty to Defend*

Under Pennsylvania law, "if a single claim in a multiclaim lawsuit is potentially covered, the insurer must defend all claims until there is no possibility that the underlying plaintiff could recover on a covered claim." Frog, Switch & Mfg. Co. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999) (citing Erie Ins. Exch. v. Transamerica Ins. Co., 516 Pa. 574, 583 (1987)). Mississippi law takes a different approach. Under Mississippi law, "the obligation of the carrier is two-fold: first, to furnish a legal defense to the claim covered under the language of the policy and, second, to pay all sums the insured becomes legally obligated to pay therefor." Moeller v. Am. Guar. & Liab. Ins. Co., 707 So. 2d 1062, 1069 (Miss. 1996), as corrected (Sept. 19, 1996). Thus, while "[t]he liability insurance company has an absolute duty to defend a complaint which contains allegations covered by the language of the policy; it clearly has no duty to defend a claim outside the coverage of the policy." Id. The Mississippi Supreme Court crystalized this difference between Pennsylvania and Mississippi law when it explained how the Mississippi rule applied to covered and non-covered claims:

> Turning to this case, it is readily apparent that in [Plaintiff's] circuit court complaint against [Defendant/Insured], only the defamation claim was covered by the policy; other claims were not. [Insurer] owed [Defendant/Insured] a legal defense to this particular claim, and to pay all sums of money the firm became legally obligated to pay for this particular claim. This is the sum total of the contractual obligation [Insurer] owed to the [Defendant/Insured]. While it may have caused some inconvenience, it would have presented no conflict of interest for [Insurer] to employ an attorney solely to defend this claim. [Insurer] would have defended, and in the event of judgment, paid this claim. [Defendant/Insured] were perfectly free to employ their own counsel, as indeed they had, to defend the other claims made against [Defendant/Insured].

Id. at 1070-71. Essentially, Pennsylvania law requires the insurer to provide a defense for covered and non-covered claims, while Mississippi law requires the insurer to provide a defense only for covered claims.

9

"If there are relevant differences between the laws, then the court should examine the governmental policies underlying each law and classify the conflict as a 'true,' false,' or an 'unprovided-for' situation.  A 'deeper [choice of law] analysis' is necessary only if both jurisdictions' interests would be impaired by the application of the other's laws (i.e., there is a true conflict)."  Hammersmith, 480 F.3d at 230.  Here, both jurisdictions' interests would be impaired by the application of the other's laws.  Pennsylvania's interest in providing liberal litigation protection to insureds on all claims, even when some claims fall outside the policy, would be impaired by the application of Mississippi's law.  Similarly, Mississippi's interest in protecting insurers from providing a defense on claims that the insurer did not contract to defend would be impaired by the application of Pennsylvania law.  This situation presents a "true" conflict and necessitates a deeper analysis.

### 3. *Conflict Analysis*

If a true conflict exists, courts are required to do a deeper analysis by weighing the "contacts establishing significant relationships," as outlined in the Restatement (Second) of Conflict of Laws (1971), against "the relevant States' policies with respect to the [underlying] controversy."  Hammersmith, 480 F.3d at 231.  It is important to remember that the relevant contacts for this analysis relate to the insurance contract, and not the event that gave rise to the coverage dispute.  Id. at 232-33 (citing McCabe v. Prudential Prop. & Cas. Ins. Co., 514 A.2d 582, 586 (Pa. Super Ct. 1986)).  While § 193 of the Restatement addresses the validity of and rights created by fire, surety, and casualty insurance contracts, I conclude, much like the Third Circuit in Hammersmith, that it provides little guidance under the current circumstances.  Here, like in Hammersmith, the insurance policy was designed to provide coverage in a large number of states.  See JA 73 (". . . within the United States of America (including its territories and

possessions), Puerto Rico or Canada."); Hammersmith, 480 F.3d at 233 (noting coverage in more

than twenty states and throughout the world).  Seeing as there is no "principal location of the

insured risk," § 193 is largely inapplicable.  Hammersmith, 480 F.3d at 233.  Instead, I turn to

§ 188(2) for instruction on the relevant factors to consider, which are: (1) the place of

contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the

location of the subject matter of the contract; and (5) the domicile, residence, nationality, place

of incorporation and place of business of the parties.  Restatement (Second) of Conflict of Laws

§ 188(2) (1971).

With respect to the place of contracting, "[a]n insurance contract is made in the state

where it is delivered."  Hammersmith, 480 F.3d at 233 (citing Harry L. Sheinman & Sons v.

Scranton Life Ins. Co., 125 F.2d 442, 444 (3d Cir. 1941).  Here, the undisputed record

demonstrates that the policy was delivered to Holdings' principal place of business in

Bethlehem, PA.  See First Brancato Decl. ¶ 9.  Compare Pls.' Statement of Uncontested Facts ¶

9, with Def.'s Statement of Disputed Facts ¶ 9 (admitting same).  Accordingly, Pennsylvania is

the place of contracting for the policy.

With respect to the place of negotiation of the contract, there is no dispute between the

parties that Plaintiffs negotiated the contract from their Bethlehem, PA office.  Compare Compl.

¶ 6 (averring that the policy was negotiated by FLS from its Bethlehem, PA office), with Answer

¶ 6 (admitting same).  Though the parties have not identified where Liberty Mutual negotiated

the contract, there is evidence that Liberty Mutual sold the policy from Massachusetts.  JA 2

(listing "SALES OFFICE" as "BOSTON, MA").  Accordingly, the place of negotiation of the

contract is Pennsylvania, likely Massachusetts, and potentially some other state or states utilized

11

by Liberty Mutual.  There is nothing in the record to suggest that Mississippi has any connection to Liberty Mutual's negotiation of the contract.

With respect to the place of performance of the contract, the insured performs in the state in which the premiums are received.  Armotek Industries Inc. v. Employers Ins. of Wausau, 952 F.2d 756, 761 (3d Cir 1991) (citing Equitable Life Assurance Society v. Nikolopulos, 86 F.2d 12, 14 (3d Cir. 1936).   FLS states that the premiums were paid from the office in Bethlehem, PA (First Brancato Decl. ¶ 9), but nothing in the record demonstrates where the premiums were received.  While it is likely that the premiums were ultimately sent to Massachusetts (home to Liberty Mutual's principal place of business and its state of incorporation), in the absence of any record support, the Court is unable to ascertain where the premiums were received.  The insurer performs where it is required to defend or pay benefits to the insured.  Specialty Surfaces Intern., Inc. v. Continental Cas. Co., 609 F.3d 223, 234 (3d Cir. 2010).  Here, Mississippi is where Liberty Mutual would have been required to defend, as the Leaf River Actual was commenced and pursued in Mississippi state court.  To the extent that Liberty Mutual actually provided any defense, a matter that is not entirely clear, Liberty Mutual would have provided that defense in Mississippi.  The parties have taken no position with respect to the place that Liberty Mutual would have been required to pay benefits to the insured.  The most likely places are Pennsylvania (to the Bethlehem, PA office) or Delaware (listed as the address for FLS US Holdings, Inc.).  JA 1.  Accordingly, Mississippi is one definite place of performance of the contract; Massachusetts, Delaware, and Pennsylvania are potentially additional places of performance.

With respect to the location of the subject matter of the contract, as noted above, given that the scope of geographical coverage under the policy includes all fifty states, this factor does not weigh in favor of applying any one state's laws.

With respect to the domicile, residence, nationality, place of incorporation and place of business of the parties, these factors favor Pennsylvania over Mississippi.  Neither FLS, nor Liberty Mutual is connected to Mississippi in any meaningful way.  On the other hand, Holdings has its principal place of business in Pennsylvania.  First Brancato Decl. ¶ 3.  While other states may have stronger connections to the parties with respect to this factor, Pennsylvania at least has some connection, while Mississippi has none.

Having evaluated the five factors, now, I "'must weigh these contacts on a qualitative scale according to their relation to the policies and interests underlying' the relevant issue on which there is a conflict" – whether an insurer must pay for the defense of both covered and non-covered claims.  Specialty Surfaces, 609 F.3d at 234 (quoting Shields v. Consolidated Rail Corp., 810 F.2d 397, 400 (3d Cir. 1987)).  Liberty Mutual urges this court to give significant weight to the "place of performance," and points to the Third Circuit's decision in Specialty Surfaces as evidence that the Third Circuit has recognized that "place of performance" can deserve such weight under certain circumstances.[4]  While I generally agree with Liberty Mutual's interpretation of Specialty Surfaces, I do not agree that the "place of performance" warrants significant weight in the instant case.

I agree with Liberty Mutual that Moeller demonstrates that Mississippi has a clear and strong interest in how a defense should be implemented when there are covered and non-covered claims.  Def.'s Opp. 6 ("Here, if a true conflict exists between the laws of Pennsylvania and

---

[4]  "[In Specialty Surfaces] the [Third Circuit] explained that while the 'place of performance' prong of § 188 of the Restatement is typically of little weight, however, where that performance involved the provision of defense counsel it becomes *eminently* important."  Def.'s Opp. 8.

Mississippi, it is only as it pertains to providing a defense to the insured. Mississippi has a strong public policy against having an insurer retain defense counsel to defend non-covered claim[s] . . .”). Mississippi has strong beliefs as to what procedure should be used by insurers, insureds, and their respective counsel to avoid conflicts of interest where there are covered and non-covered claims. See Moeller, 707 So.2d at 1068-71. However, this procedure was not even remotely complied with while the Leaf River Action was ongoing, so Mississippi's interest was never truly activated with respect to the defense of the Leaf River Action.[5] This failure to activate Mississippi's interest is due to Liberty Mutual's initial refusal to provide a defense, and its subsequent failure to insist upon independent counsel when it ultimately agreed that there might be a covered claim in the Leaf River Action. Liberty Mutual cannot have it both ways: it cannot ignore the laws of the place of performance when the action is ongoing, and then seek to benefit from the laws of the place of performance when litigating who should pay for that defense. Liberty Mutual's failure to conform the laws of the place of performance during the course of the underlying action militates strongly against awarding the place of performance the substantial weight Liberty Mutual argues it deserves.

    I am not persuaded that Mississippi's seemingly strong interest in how a defense should be implemented to avoid conflicts of interest should also be regarded as a strong interest in how that defense is paid for, especially when an insurer does not adhere to the defense implementation procedures that Mississippi requires.[6] This is particularly true where the defense

---

[5] Unlike the insurer in Hartford Underwriters Ins. Co. v. Foundation Health Services, Inc., 524 F.3d 588 (5th Cir. 2008), the Fifth Circuit decision interpreting Mississippi law that the Specialty Surfaces decision discusses, Liberty Mutual never retained independent counsel to defend FLS in the Leaf River Action.
[6] As stated by Liberty Mutual, "Mississippi law has a strong state interest in the manner in which an insurance company defends its insured." Def.'s Opp. at 7. While this appears to be true, it does not mean that Mississippi has any interest at all where an insurer does not defend its insured (or where it initially refuses to defend, then later agrees to defend but takes none of the steps necessary under the forum state's defense procedures).

of the underlying action is complete, and there is no ongoing risk of offending Mississippi's interest in preventing conflicts of interest.  Accordingly, the relevant Mississippi interest in this case is not its strong interest related to how a defense should be implemented to avoid conflicts of interest by lawyers practicing in its courts, as articulated in Moeller.  Rather, Mississippi's relevant interest is a much weaker one related to protecting insurance companies from defending claims they did not contract to defend.

Assigning the "place of performance" factor the relatively little weight that I believe it deserves in light of the foregoing, and considering the relatively greater weight that I believe I must assign the "place of negotiation," "place of contracting," and "place of domicile, residence, nationality, place of incorporation and place of business of the parties," I conclude the Pennsylvania law governs the scope of the duty to defend that Liberty Mutual owed to FLS under the Policy.

B.  Remaining Summary Judgment Claims

Having decided that: (1) Pennsylvania law and Mississippi law utilize the same standard to determine when Liberty Mutual owed FLS a duty to defend under the Policy, and (2) Pennsylvania law applies to the scope of the duty to defend that Liberty Mutual owed FLS under the Policy, the Court must now consider the remaining relief sought in the parties' summary judgment motions.  This places the Court in a challenging position given the somewhat bizarre procedural posture of this case and the relatively sparse record presented for consideration. Whether the result of a misunderstanding among the Court and the parties at the Rule 16 conference, or a miscommunication between the parties before or after the Rule 16 conference, the parties had disparate understandings of what could and would be submitted to the Court in support of their respective summary judgment motions.  See, e.g., Hr'g. Tr. (ECF No. 38) 4-5, 8-

15

9, 12-13, 30-31, 54-56, 59-61.  As a result, FLS submitted three declarations in support of its summary judgment motion, two from Mark Brancato (ECF Nos. 14-2, 17), and one from James Benjamin (ECF No. 16); Liberty Mutual submitted none.  It is clear that Liberty Mutual had ample opportunity to submit rebuttal declarations to demonstrate which material facts are in dispute, or explain why summary judgment should be delayed in favor of discovery.  Despite Liberty Mutual's curious failure to submit such declarations, the Court will deny the remaining portions of the parties' summary judgment motions without prejudice, and grant Liberty Mutual's request for discovery.  The parties may re-raise their arguments with respect to the extent of the coverage under the Policy and the appropriate allocation of the settlement amount after the close of discovery, as the Court would benefit from a complete and undisputed factual record before granting any further dispositive relief.

   An appropriate order follows.